[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-12065
_____

D.C. Docket No. 1:09-cr-20628-DLG-3

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

NELIDA RODRIGUEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 15, 2014)

Before MARCUS, Circuit Judge, and COOGLER[*] and BOWEN,[**] District Judges.

COOGLER, District Judge:

## I.    Introduction

This appeal presents several issues arising from the seventy-month prison sentence of Defendant Nelida Rodriguez ("Rodriguez") following her guilty plea to conspiracy to commit mail and wire fraud, 18 U.S.C. § 1349; mail fraud, 18 U.S.C. §§ 1341 and 2; and wire fraud, 18 U.S.C. §§ 1343 and 2.  She argues, first, that her guilty plea violated her constitutional rights and was not knowing and voluntary.  Her basis for this argument is that she told the district judge she suffered from a mental illness, consulted with her attorney multiple times, and did not receive the full protections of Federal Rule of Criminal Procedure 11 ("Rule 11").  She argues, second, that we should vacate and remand for re-sentencing because the district court applied unsupported sentencing enhancements and applied the incorrect legal standard when denying a minor role reduction.  Finally, she contends that the district court's restitution award lacked evidentiary support, and that the delay of two years between her sentencing and the amended judgment

---

[*] Honorable L. Scott Coogler, United States District Judge for the Northern District of Alabama, sitting by designation.

[**] Honorable Dudley H. Bowen, Jr., United States District Judge for the Southern District of Georgia, sitting by designation.

ordering restitution removed jurisdiction from the district court to order restitution and violated her due process rights.

After careful review of the record and the briefs of the parties, and having the benefit of oral argument, we affirm Rodriguez's guilty plea, sentence, and the restitution order.

II.    Background

a. Facts[1]

A mortgage fraud scheme was operated from June 2005 through March 2007 involving Rodriguez and other defendants. As part of the scheme, numerous fraudulent loan applications were submitted to lenders across the United States in order to obtain loans on properties in Miami-Dade County and Broward County, Florida. As a result of the scheme, several lenders were caused to lose significant sums of money.

Magile Cruz ("Cruz"), the leader and organizer of the scheme, owned and operated Star Lending Mortgage, State Mortgage Lending, Sherley Title Services, Doral Title Services, and Professional Title Express. Cruz would identify residential properties for sale through her mortgage brokerage and mortgage lending businesses. She and others would then prepare on behalf of "straw buyers"

---

[1] The facts contained herein are gleaned from the portions of the Presentence Investigation Report ("PSI") to which Rodriguez did not object. "It is the law of this circuit that a failure to object to allegations of fact in a PSI admits those facts for sentencing purposes." *United States v. Wade*, 458 F.3d 1273, 1277 (11th Cir. 2006).

3

fraudulent mortgage loan applications.  The applications included false employment verifications, pay stubs, income and funds on deposit verifications, and Internal Revenue Service forms.  In addition, some of the co-conspirators would recruit and pay individuals to pose as buyers and to ostensibly participate in the purchase of the selected properties.  These straw buyers had no intention of residing in the purchased properties but made contrary representations to the lenders.  Cruz and her co-conspirators paid the straw buyers $5,000 for every property on which their credit was used.  In addition, as part of the fraudulent loan documentation submitted to the lenders, Cruz and the co-conspirators would represent themselves to be agents for title insurance companies and falsely claim the subject property to be covered by title insurance.

Lenders, after clearing the loans for closing, would forward the funds via wire, from outside the state of Florida, to companies owned and controlled by Cruz and her co-conspirators located in Florida.  The lenders would then send various mortgage documents which included the Good Faith Estimate, Servicing Agreement, and RESPA Compliance documentation to the straw buyers via the United States Postal Service.

Finally, as part of the scheme to defraud, Cruz and her co-conspirators filed change of address forms with the United States Postal Service on behalf of the straw buyers.  The forms changed the straw buyers' addresses from the loan

4

properties to a P.O. Box under the control of Cruz and her co-conspirators.  By submitting the change of address forms on behalf of the straw buyers, Cruz and her co-conspirators concealed from the individuals actually living at the addresses that their properties had been fraudulently sold.

Cruz and her co-conspirators then made payments on the fraudulently obtained mortgages via checks and money orders in order to keep the mortgage loans afloat until the properties could be "resold," often to another straw buyer. Ultimately Cruz ceased making payments on the properties, causing them to go into default and some into foreclosure.

Rodriguez, a friend of Cruz, worked for her at one of her companies and was listed as President of Professional Title Express, another of Cruz's companies.  At Cruz's request, Rodriguez opened two P.O. Boxes in Doral, Florida, to which mortgage-related documents were redirected via change of address forms in order to avoid detection of the fraud.  Rodriguez also made monthly mortgage payments on mortgages in straw buyers' names to lenders by checks drawn on her own account at Union Planters Bank.  One straw buyer identified Rodriguez as the person who delivered her check as payment for the use of her credit, while another straw buyer identified Rodriguez as the person who went to the bank and returned with money to pay him for his participation in the scheme.

Rodriguez, herself, acted as a straw buyer for the "purchase" of a property located at 10224 Northwest 130 Street, Hialeah Gardens, Florida, receiving $12,000 for the use of her credit. Rodriguez was also the purported seller of property in a fraudulent transaction involving her husband, co-defendant Pedro Huezo.

### b. Procedural History

On July 23, 2009, a Southern District of Florida grand jury returned a twenty-count indictment, charging Rodriguez and eighteen co-defendants with participating in the above-described mortgage fraud scheme. On January 9, 2010, Rodriguez pled guilty to Count One, conspiracy to commit mail and wire fraud, 18 U.S.C. § 1349; Count Two, mail fraud, 18 U.S.C. §§ 1341 and 2; and Count Twelve, wire fraud, 18 U.S.C. §§ 1343 and 2. There was no oral or written plea agreement.

According to her PSI, Rodriguez's base offense level was seven.[2] The PSI asserted that the fraudulent transactions resulted in over $19 million being lost by at least twenty-three lenders. As such, the PSI increased the base offense level by twenty levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(K), based upon a loss of more than $7 million and less than $20 million. The offense level was further increased by two levels, pursuant to section 2B1.1(b)(2)(A)(i), because the offense involved

---

[2] Rodriguez's PSI relied upon section 2B1.1 of the 2009 U.S. Sentencing Guidelines Manual ("U.S.S.G."), which applies to offenses involving fraud.

6

ten or more victims, and another two levels, pursuant to section 2B1.1(b)(10)(C), because the offense involved the use of sophisticated means. Finally, it was increased by three levels, pursuant to section 3B1.1(b), because of Rodriguez's role in the offense as a manager or supervisor, but then decreased by three levels, pursuant to section 3E1.1(a) and (b), for acceptance of responsibility. As a result, Rodriguez was assigned a total offense level of thirty-one, which when combined with a criminal history category of I, resulted in a guideline sentencing range of 108 to 135 months' imprisonment.

Rodriguez objected to the PSI on several grounds. She argued that she was not paid $60,000 for a transaction involving her husband, that the loss amount attributed to her was overstated, and that she was not a supervisor but instead played a minor role in the scheme.

The district court conducted Rodriguez's sentencing hearing over the course of two days, at which time Rodriguez made only two objections: one based upon the enhancement for her role in the offense and the other based upon the enhancement for the loss amount attributable to her. Along with her objection to the supervisory role enhancement, Rodriguez also moved for a two-level minor role reduction pursuant to U.S.S.G. § 3B1.2(b). At sentencing, the government argued that the loss amount applicable to Rodriguez was $12,024,168.03, deriving this figure by assigning a loss-value to each of the properties connected to her.

After weighing the extensive evidence including hours of testimony and argument, the district court sustained Rodriguez's objection to the supervisory role enhancement but denied her request for a two-level minor role reduction, and determined that the loss attributable to Rodriguez was over $12 million.  The court recalculated the total offense level at twenty-eight, rather than thirty-one, resulting in a sentencing range of seventy-eight to ninety-seven months' imprisonment. However, the court determined that a sentence below the guideline range was appropriate to prevent a disparity in sentencing among other co-conspirators as well as Cruz.  The court noted that Cruz, who had been indicted in a separate case, had been held responsible for less than $7 million.  Rodriguez was ultimately sentenced to seventy months' imprisonment as to each count with each count to run concurrently, and a three year term of supervised release following her imprisonment.

At the conclusion of the sentencing hearing, the court stated that "mandatory restitution is appropriate," but noted that the victims' losses were not yet ascertainable and informed the parties that it would set a date for the final determination of restitution "not to exceed ninety days after sentencing."  (District Court Docket Entry ("D.E.") 734 at 87:13-22.)  When the court entered its judgment on April 30, 2010, it noted that "the determination of restitution is deferred until July 28, 2010" at which time an amended judgment would be

entered.  (D.E. 714 at 5.)  Rodriguez filed a notice of appeal when the April 30, 2010 judgment was entered.

On July 27, 2010, the government moved to continue the restitution hearing, citing *Dolan v. United States*, 560 U.S. 605, 130 S.Ct. 2533, 177 L.Ed.2d 108 (2010).[3]  The district court granted the motion but did not immediately reset the hearing.

Meanwhile, this Court questioned its jurisdiction over Rodriguez's appeal due to the incomplete judgment and ordered the parties to provide supplemental briefing on the issue of whether Rodriguez's sentence was final even though the restitution amount remained outstanding, citing 28 U.S.C. § 1291 and *Dolan*.  The parties filed a joint response, insisting that this Court had jurisdiction over the appeal, but requesting a stay of the appeal until the issue of restitution was resolved.  The motion to stay was granted.

On June 30, 2011, Rodriguez filed a pleading in the district court captioned, "Motion for Re-sentencing in Order to Set Restitution," in which she argued that the district court should vacate its prior judgment and conduct an entirely new sentencing hearing so that her restitution proceeding could be conducted within the

---

[3] *Dolan*, which had been decided by the Supreme Court the prior month, held that a sentencing court that missed the ninety-day deadline in which to order restitution as set out in 18 U.S.C. § 3664(d)(5) nonetheless retains the power to order restitution as long as the sentencing court made clear prior to the deadline's expiration that it would order restitution, leaving open only the amount.  560 U.S. at 611, 130 S.Ct. at 2539.

ninety-day period provided for in 18 U.S.C. § 3664(d)(5).  She also filed a pleading in this Court entitled, "Motion for Summary Remand to the District Court," in which she essentially made the same argument.  The government filed a response that we construed as a motion to dismiss Rodriguez's appeal as premature.  This Court denied both motions, stayed the appeal until the conclusion of the district court's restitution proceedings, and ordered the Clerk to consolidate this appeal with any appeal that Rodriguez might file from the district court's restitution order.

On January 30, 2012, the government submitted a request in the district court to schedule a restitution hearing "as soon as is reasonably possible."  In response, a magistrate judge, to which the restitution issue had been referred, scheduled a restitution hearing for March 29, 2012.  Rodriguez then moved to reschedule that hearing in order to give her more time to prepare.  The hearing was rescheduled for April 17, 2012.  On the day before the rescheduled hearing, Rodriguez again moved to postpone it, and the magistrate judge rescheduled it for June 11, 2012.  After hearing testimony on that date, the magistrate judge recommended that the district court deny Rodriguez's motion for re-sentencing and impose restitution in the amount of $7,941,854.42.  The district court considered *de novo* the report and recommendation, as well as the objections Rodriguez filed thereto, and adopted the report and recommendation.  The district court thus

10

entered an amended judgment setting restitution in the amount of $7,941,854.42, for which Rodriguez was jointly and severally liable with her co-defendants in this case and with Cruz.

Rodriguez appealed the amended judgment, and this Court removed the stay and ordered briefing of the appeal to resume.

III.    Discussion[4]

a.  Guilty Plea

Rodriguez argues for the first time on appeal that the guilty plea proceedings violated her constitutional rights and failed to comport with the core components of Rule 11.  She contends that she was not competent to plead guilty due to mental illness, that her guilty plea was not knowing and voluntary because the district court did not adequately explain her rights or the charges against her, and that there was an insufficient factual basis for her plea.

We review for plain error when a defendant, as with Rodriguez, fails to object in the district court to a claimed Rule 11 violation, including a claim that there was an insufficient factual basis for a guilty plea.  *See United States v. Vonn*, 535 U.S. 55, 58-59, 122 S.Ct. 1043, 1046, 152 L.Ed.2d 90 (2002); *United States v.*

---

[4] Before reaching the merits of Rodriguez's appeal, we take a moment to satisfy ourselves that we have jurisdiction.  *See United States v. Lopez*, 562 F.3d 1309, 1311 (11th Cir. 2009) (this Court is required to examine its jurisdiction *sua sponte*).  Section 3664(o), Title 18, United States Code, provides that a "sentence that imposes an order of restitution," such as the amended judgment here, "is a final judgment."  There is thus no question that we now have jurisdiction pursuant to 28 U.S.C. § 1291.

*Franklin*, 323 F.3d 1298, 1299 n.1 (11th Cir. 2003).  We also find that we should review for plain error when a defendant fails to object to the district court's determination that she is competent to plead guilty.  *See United States v. Bennett*, 518 F. App'x 660, 663 (11th Cir. 2013) (unpublished) (holding that the district court did not commit plain error when it found that the defendant was competent to enter his guilty plea, where the defendant asserted for the first time on appeal that he did not understand the consequences of his guilty plea due to limited mental capacity and paranoia) (citing *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005), for the general rule that errors not raised in the district court are reviewed for plain error).[5]  "To establish plain error, a defendant must show there is (1) error, (2) that is plain, and (3) that affects substantial rights."  *United States v. Moriarty*, 429 F.3d 1012, 1019 (11th Cir. 2005) (citing *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993)).  In the Rule 11 context, a defendant who seeks to establish plain error "must show a reasonable probability that, but for the error, [s]he would not have entered the plea."  *United States v. Dominguez Benitez*, 542 U.S. 74, 83, 124 S.Ct. 2333, 2340, 159 L.Ed.2d 157 (2004).

> i.  *Competence*

---

[5] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  *See* 11th Cir. R. 36-2.  We find the rationale in *Bennett* persuasive.  *See Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007) ("Unpublished opinions are . . . persuasive only insofar as their legal analysis warrants.").

"The due process clause prohibits the trial or guilty plea conviction of a person who is mentally incompetent." *Sheley v. Singletary*, 955 F.2d 1434, 1437 (11th Cir. 1992). Further, the standard of "competence" required to plead guilty is the same standard used by courts to determine whether an individual is competent to stand trial, that is, "'whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" *Godinez v. Moran*, 509 U.S. 389, 396-98, 113 S.Ct. 2680, 2685-86, 125 L.Ed.2d 321 (1993) (quoting *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 788-89, 4 L.Ed.2d 824 (1960) (per curiam)). As such, an allegation of mental illness or other mental disability does not invalidate a guilty plea if the defendant was still competent to enter that plea. *See Bolius v. Wainwright*, 597 F.2d 986, 990 (5th Cir. 1979) ("The mental illness or disability must have been so debilitating that [the defendant] was unable to consult with [her] lawyer and did not have a rational and factual understanding of the proceedings.") (citing *Dusky*, 362 U.S. at 402, 80 S.Ct. at 788-89);[6] *see also Pardo v. Sec'y, Fla. Dept. of Corr.*, 587 F.3d 1093, 1101 (11th Cir. 2009) (absent evidence of an inability to assist counsel, the defendant's

---

[6] In *Bonner v. City of Pritchard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

"low intelligence, mental deficiency, bizarre, volatile, or irrational behavior, or the use of anti-psychotic drugs is not sufficient to show incompetence").[7]

The district judge conducted a thorough and comprehensive discussion with Rodriguez at her change of plea hearing, inquiring in numerous ways about her mental health.  In response to his questions, Rodriguez indicated that she had been undergoing treatment for mental illness for the past year, beginning with her arrest in this case; that she was under the care of a psychologist and a doctor; and that she was taking three types of medication prescribed for depression and to help her sleep, although she could only remember the name of one medication—Clonazepam.  She further indicated that she had taken "her pill" the day of the hearing.  The district judge then took great care to ascertain whether Rodriguez was capable of understanding the proceeding and was able to communicate with counsel.  Rodriguez testified that, notwithstanding her medication, she could understand the conversations she had had with her attorney.  Although she initially testified that she was not able to understand the conversations she'd had with other individuals, she then clarified that her inability to understand was not due to the

---

[7] The standard of competence to enter a plea of guilty or to stand trial is the same whether the criminal proceeding is in state or federal court.  Although all of the aforementioned cases, with the exception of *Dusky*, were 28 U.S.C. § 2254 habeas corpus challenges to guilty pleas or convictions in state courts, in *Malinauskas v. United States*, this Court held that the *Dusky* test of mental competency also applies to entering a guilty plea in a federal criminal case.  505 F.2d 649, 654 (5th Cir. 1974); *see also Bolius*, 597 F.2d at 988 n.3 (noting that the *Dusky* standard of competence to stand trial or to enter a plea of guilty applies in both state and federal criminal proceedings).

14

medication she was taking.[8]  Rodriguez's counsel then stated that he had had no difficulty communicating with his client or having her understand fairly complex legal issues.  Counsel for the government likewise stated that during his interview

---

[8] More specifically, the following colloquy transpired:

> COURT: Have you been able to understand the conversations you've had with other individuals?
>
> DEFENDANT: No.
>
> COURT: And could you discuss that in a little more detail?
>
> DEFENDANT: What I meant to say is that I recently had an interview with the U.S. Attorney – the Assistant U.S. Attorney and also with Mr. Salinas and they showed me some papers and the papers say things that I never said.
>
> COURT: Are you referring to transcripts or other documents?
>
> DEFENDANT: Could you explain your question, please?
>
> COURT: You said the papers show things that you are not familiar with. Are you referring to transcripts of conversations or other types of documents?
>
> DEFENDANT: The documents from the interviews that he had with me.
>
> COURT: Well is your understanding of what's on the documents affected by the medication you are taking or some other reason?
>
> DEFENDANT: How was that question?
>
> COURT: You indicated that you, based upon certain medication, have had trouble understanding certain issues. Is that correct? Is it because of the medication or is it because of some other reason that you're not understanding certain items?
>
> DEFENDANT: No, it's not because of the medication. There are just other matters that I have not understood.

(D.E. 532 at 5:13-25; 6: 1-17.)

with Rodriguez he had no trouble communicating with her or having her understand him. The district judge then questioned Rodriguez again with regard to whether she had any problems understanding or communicating with others as a result of her medication, to which she responded that she had not.

During the course of the change of plea hearing, Rodriguez periodically paused to consult with her attorney before responding to a question by the court. After each of these brief discussions with her attorney, Rodriguez confirmed that she understood the question posed by the court. Her attorney also confirmed that Rodriguez understood the questions posed. At one point Rodriguez's daughter interrupted the hearing to state that she was not sure that Rodriguez understood what was going on and asked to speak with her mother privately. The district judge allowed Rodriguez to confer with her attorney and her daughter, after which he again confirmed that Rodriguez understood the questions as well as the plea she was about to enter:

> COURT: All right. You obviously had some discussions with your daughter and your lawyer. As a result of those discussions or any other reason, do you have any questions about any matter that has been raised during the plea colloquy?
>
> DEFENDANT: No.

(D.E. 532 at 23:12-17). Simply put, there is no evidence or indication that Rodriguez was unable to consult with her attorney or understand the advice offered

16

to her.  As such, no error, plain or otherwise, was committed by the district judge in determining that Rodriguez was competent to enter a plea of guilty.

### ii.    Knowing and Voluntary Plea

Of course, a finding that a defendant is competent to plead guilty is not all that is required.  Because "a guilty plea involves the waiver of a number of a defendant's constitutional rights," the district court must also ensure that the guilty plea is made "knowingly and voluntarily to satisfy the requirements of due process." *Moriarty*, 429 F.3d at 1019.  In accepting a defendant's guilty plea, the district court must specifically address the three "core principles" of Rule 11 by "ensuring that a defendant: (1) enters [her] guilty plea free from coercion; (2) understands the nature of the charges, and (3) understands the consequences of [her] plea." *Id.*  To ensure compliance with the third core concern, Rule 11(b)(1) provides a list of rights and other relevant matters about which the court must inform the defendant and assure itself that the defendant understands prior to accepting a guilty plea.  *See* Fed. R. Crim. P. 11(b)(1).

The district judge ensured that Rodriguez was not threatened or forced into pleading guilty, satisfying the first core concern.  *See* Fed. R. Crim. P. 11(b)(2). The district judge also satisfied the second core principle by detailing the charges of conspiracy, mail fraud, and wire fraud against Rodriguez, explaining in detail the allegations and elements of each charge.  Following the explanation, Rodriguez

confirmed she understood the allegations and elements of the charges against her.

Rodriguez quarrels with the manner in which the court addressed the third core principle, specifically the matters set forth in Rule 11(b)(1)(D), (G), and (K). However, the district judge explained Rodriguez's rights to her in detail, including her right to plead not guilty, her right to counsel, and the consequences if she chose to plead guilty, specifically including the rights she would waive as a result. After each explanation, the judge asked Rodriguez if she understood, and each time she answered affirmatively. Rodriguez also acknowledged that she understood the maximum punishment authorized for her offenses—twenty years of imprisonment plus supervised release—and that the court would order restitution for the losses caused by the offenses.

Regardless, Rodriguez insists that the manner in which the district judge informed her of her right to counsel constituted an error because the judge's language did not precisely track the language of Rule 11(b)(1)(D). To the contrary, when the judge asked Rodriguez if she understood that she had "the right to the assistance of an attorney," he satisfied Rule 11(b)(1)(D). (D.E. 532 at 9:5-6.) In assessing whether a colloquy satisfies the provisions of Rule 11, "matters of substance, not form, are controlling." *United States v. Monroe*, 353 F.3d 1346, 1351 (11th Cir. 2003).

18

Similarly, there is no merit to Rodriguez's argument that the court failed to inform her of the court's authority to order restitution. When the court asked the government to inform Rodriguez of the punishment authorized, and the government stated that "the Court shall order restitution for all losses caused by the offenses," the district court clearly satisfied Rule 11(b)(1)(K). (D.E. 532 at 11:6-7.) *See United States v. Hernandez-Fraire*, 208 F.3d 945, 950 (11th Cir. 2000) ("Rule 11 [] does not say that a court's only means of compliance is to read the specified items *in haec verba*. Instead, any variations or deviations from the procedures mandated by Rule 11 that do not affect a defendant's substantial rights constitute harmless error.") (internal citation omitted).

Finally, Rodriguez's contention that plain error occurred because the court did not explain to her the meaning of "interstate commerce" is misplaced. Nothing in the text of Rule 11 imposes such an obligation, and no question was raised as to the term's meaning during the change of plea hearing. Rodriguez has failed to demonstrate any error, much less error that is plain or obvious, with respect to the district court's compliance with Rule 11.

### iii. *Factual Basis for Plea*

Rodriguez's assertion that there was an insufficient factual basis to accept her guilty plea is also belied by the record. "Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea." Fed. R.

19

Crim. P. 11(b)(3). A "factual basis for the plea" simply means that "there must be evidence from which a court could reasonably find that the defendant was guilty," and "uncontroverted evidence of guilt" is not required. *United States v. Owen*, 858 F.2d 1514, 1516-17 (11th Cir. 1988). At the hearing, Rodriguez confirmed that she understood the government's proffer of the factual basis for the charges against her, asserting reservations to only three facts: (1) that she was paid $60,000 for a transaction involving her husband, (2) that the amount of the loss was between $7 million and $20 million, and (3) that she had paid two straw buyers for the use of their credit. With those reservations, Rodriguez confirmed that she had committed the offenses in the indictment. Rodriguez, her attorney, the government, and the court all agreed that there was a sufficient factual basis for Rodriguez's guilty plea. Indeed, the portions of the factual basis not objected to—including mailing fraudulent mortgage loan applications, faxing requests for release of funds on fraudulent loans, paying money owed on fraudulent mortgages, participating in the fraud as a straw buyer, and opening P.O. Boxes to reroute mail and conceal the fraud—establish that Rodriguez knowingly participated in a scheme or artifice to defraud by using the mail and wires. Based on these statements, the court was justified in concluding that Rodriguez's plea was supported by a sufficient factual basis.

Accordingly, the district court did not plainly err in accepting Rodriguez's guilty plea.

### b.  Sentencing Issues

#### i.    Twenty-Level Enhancement for Losses over $7 Million

Rodriguez contends that the district court erred in finding her responsible for over $12 million in losses and thus imposing a twenty-level guideline enhancement to her offense level.  As Rodriguez objected to the loss amount in the PSI and during the sentencing hearing, we review this issue for clear error.  *United States v. Manoocher Nosrati-Shamloo*, 255 F.3d 1290, 1291 (11th Cir. 2001) ("A district court's determination regarding the amount of loss for sentencing purposes is reviewed for clear error.").  There is "no clear error in cases in which the record supports the district court's findings."  *United States v. Petrie*, 302 F.3d 1280, 1290 (11th Cir. 2002).

Section 2B1.1(b)(1) of the sentencing guidelines instructs courts to increase a defendant's offense level based on the loss attributable to that defendant.  U.S.S.G. § 2B1.1(b)(1).  Further, "[t]he government must prove the attributable loss by a preponderance of the evidence."  *United States v. Dabbs*, 134 F.3d 1071, 1081 (11th Cir. 1998).  The guidelines define "loss" as "the greater of actual loss or intended loss."  U.S.S.G. § 2B1.1 cmt. n.3(A).  Actual loss is the "reasonably foreseeable pecuniary harm that resulted from the offense."  *Id.* § 2B1.1 cmt.

21

n.3(A)(i).  Intended loss is the "pecuniary harm that was intended to result from the offense," even if the harm was "impossible or unlikely to occur."  *Id.* § 2B1.1 cmt. n.3(A)(ii).  Pecuniary harm is a harm that is "monetary or that otherwise is readily measurable in money" and does not include things such as emotional distress and harm to reputation.  *Id.* § 2B1.1 cmt. n.3(A)(iii).  A reasonably foreseeable pecuniary harm is one that the defendant "knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  *Id.* § 2B1.1 cmt. n.3(A)(iv).

In addition, proper calculation of the guidelines requires consideration of "all relevant conduct," not merely charged conduct.  *United States v. Hamaker*, 455 F.3d 1316, 1336 (11th Cir. 2006).  Relevant conduct includes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction."  U.S.S.G. § 1B1.3(a)(2).  A participant in a conspiracy may thus be held "responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy."  *United States v. Mateos*, 623 F.3d 1350, 1370 (11th Cir. 2010).

The district court did not clearly err in finding as fact that the loss attributable to Rodriguez was over $12 million.  Although the PSI cited a loss of over $19 million, at sentencing the government introduced as an exhibit a spreadsheet demonstrating that the total loss amount attributable to Rodriguez was

actually $12,024,168.03.  The government explained that it derived this number by adding together the amount of the loss on the property for which Rodriguez acted as a straw buyer, the amount of the loss on the property for which her husband acted as a straw buyer, and the amount of the losses on the properties for which she redirected fraudulent loan documents through the use of her P.O. Boxes.  The court then asked the government to explain the evidence with regard to Rodriguez and the change of address forms, to which the government responded that Rodriguez opened and controlled P.O. Boxes Nos. 227005 and 226834, and change of address forms filed by her co-conspirators directed fraudulent loan documents to those P.O. Boxes.  By rerouting the mail, the conspirators concealed from the individuals who actually lived at the addresses that their properties had been fraudulently sold, and in many cases, to more than one straw buyer.  The government carried its burden and proved the attributable losses with sufficient indicia of reliability.[9]

At sentencing, Rodriguez argued that she should not be held responsible for the losses on the properties associated with her P.O. Boxes because her connection to those losses was too tenuous and because she did not work for Cruz for the

---

[9] We reject as untenable the position Rodriguez's counsel took at oral argument that the government's spreadsheet was never introduced into evidence at the sentencing hearing.  It is clear from the transcript of the sentencing hearing that the government handed the spreadsheet to the judge, that the judge marked it as Exhibit I, and that the judge and counsel discussed the calculations on the spreadsheet in detail in the context of the loss amount attributable to Rodriguez.  Rodriguez's counsel admitted at oral argument that the spreadsheet was referred to, marked, and used by the court.  In addition, Rodriguez's trial counsel made no contemporaneous objection to the spreadsheet's use during the hearing.

entire length of the conspiracy.  These arguments are without merit, as explained

above.  Rodriguez participated in the conspiracy and did not withdraw from it, thus

she is responsible for the losses resulting from the reasonably foreseeable acts of

co-conspirators in furtherance of the conspiracy.  *See* U.S.S.G. § 1B1.3(a)(1)(B),

(a)(3); *Dabbs*, 134 F.3d at 1082 ("[T]he district court may hold all participants in a

conspiracy responsible for the losses resulting from the reasonably foreseeable acts

of co-conspirators in furtherance of the conspiracy.").  Indeed, Rodriguez's action

in controlling the P.O. Boxes was "relevant conduct" in accordance with U.S.S.G.

§ 1B1.3 because rerouting the mail was essential to the success of the fraudulent

scheme as it helped the conspirators avoid detection.   We uphold the district

court's determination of the loss amount as it applied to Rodriguez.[10]

> ii.    *Two-Level Enhancements for Use of Sophisticated Means and*
>        *Multiple Victims*

---

[10] We wish to make clear that Rodriguez never objected to the *accuracy* of the $12 million loss amount or the method by which the government calculated that total.  At sentencing, her counsel's arguments were always that the *attribution* of that amount to Rodriguez was unwarranted because the losses were unforeseeable to her as a low-level member of the conspiracy.  On appeal, however, Rodriguez appears to also take issue with the methodology the government used in calculating the figures on the spreadsheet, arguing that the government's formula distorted the loss figures on several properties and that the district court erred in merely adopting the government's proffer of a means of loss calculation. (Appellant's Brief at 14, 17.) Rodriguez asserts that "the government's mere argument and proffer of evidence is insufficient to carry the government's evidentiary burden as to a disputed sentencing fact," (Appellant's Brief at 17), but she ignores the fact that the method by which the government calculated the amount was never in dispute, something her counsel admitted at oral argument.  If Rodriguez is now arguing that the district court should have more thoroughly investigated or otherwise challenged the government's calculation formula, despite no objection being made to it, our review would be for plain error, and we find none. *See Rodriguez*, 398 F.3d at 1298.

Rodriguez also argues for the first time on appeal that the district court erred in imposing two-level enhancements each for multiple victims and use of sophisticated means.  As previously stated, we review objections to sentencing issues that were not raised in the district court for plain error and can only make corrections if there is plain error that affects substantial rights.  *Rodriguez*, 398 F.3d at 1298.  If these conditions are met, we may exercise our discretion to notice a forfeited error, but only if the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Id.* (quotation marks omitted).

The sentencing guidelines call for a two-level increase in the defendant's offense level if the offense involved ten or more victims.  U.S.S.G. § 2B1.1(b)(2)(A)(i).  A "victim" for sentencing enhancement purposes is any person—including "individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies"—who "sustained any part of the actual loss . . ."  *Id.* § 2B1.1(b)(2) cmt. n.1.  Rodriguez's PSI concluded that the fraudulent transactions were funded by at least twenty-three lenders.  Since Rodriguez never objected to that fact, she effectively admitted that there were twenty-three lender victims.  *See United States v. Shelton*, 400 F.3d 1325, 1330 (11th Cir. 2005) (failure to object to PSI's factual statements constitutes admission of those facts).  Without an objection, there was no call for the government to put on specific evidence of the victims at sentencing.  *See United States v. Lawrence*,

25

47 F.3d 1559, 1566 (11th Cir. 1995) (explaining that the PSI "serves a role similar to a pretrial stipulation in a civil case by identifying factual and legal issues that remain in dispute," and only when the defendant challenges one of the factual bases of his sentence does the government have to establish that disputed fact by a preponderance of the evidence).  In any event, the government's spreadsheet introduced without objection as evidence at the sentencing hearing shows that more than ten lenders, servicers, or loan holders were involved in the fraudulent loans attributed to Rodriguez.   Nonetheless, Rodriguez asserts that the number of victims is limited to the number of victims to which restitution was eventually ordered—seven.  However, her position is contrary to law.  *See United States v. Foley*, 508 F.3d 627, 633-34 (11th Cir. 2007) (holding that the district court erred in finding the number of victims for purposes of the multiple-victim sentencing enhancement by using the number of individuals who had responded to letter from probation office about restitution).  The district court did not plainly err in enhancing Rodriguez's sentence for an offense involving more than ten victims under section 2B1.1(b)(2)(A)(i).

Similarly, the sophisticated means enhancement was not plainly erroneous. "Sophisticated means" connotes "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense" and can include such conduct as "hiding assets or transactions, or both, through the use of fictitious

26

entities [and] corporate shells." U.S.S.G. § 2B1.1 cmt. n.9. The sentencing guidelines provide for a two-level enhancement when the offense involves the use of sophisticated means. *Id.* § 2B1.1(b)(10). The non-objected-to facts in the PSI clearly indicate that Rodriguez participated in a scheme that utilized straw buyers, fraudulent mortgage documents, fake title corporations, as well as the improper diversion of the U.S. mail. We uphold the district court's enhancement for sophisticated means.

### iii.    Minor Role Reduction

Rodriguez argues that she deserves a minor-role reduction based upon her self-described status as a mere personal assistant to Cruz. We review for clear error the district court's determination of Rodriguez's role in the offense as a finding of fact. *United States v. Rodriguez De Varon*, 175 F.3d 930, 937 (11th Cir. 1999) (en banc).

A two-level reduction in the offense level is appropriate when a defendant functions as a minor participant in the criminal activity. U.S.S.G. § 3B1.2(b). A minor participant is one that is "less culpable than most other participants, but whose role could not be described as minimal." *Id.* § 3B1.2(b) cmt. n.5. The defendant bears the burden of proving, by a preponderance of the evidence, that she is entitled to the reduction. *Rodriguez De Varon*, 175 F.3d at 939. In determining whether a mitigating role is warranted, a district court must consider

27

two principles: 1) the defendant's role measured against the relevant conduct for which she has been held accountable at sentencing; and 2) her role as compared to other participants in that relevant conduct.  *Id*. at 940.

On the record before us, we find no error in the district court's determination that Rodriguez did not deserve a minor role reduction.  The court, the government, and Rodriguez's attorney questioned Rodriguez extensively concerning her role as it related to the aggravating role enhancement in the PSI and Rodriguez's request for a minor role reduction.  The court also heard evidence of Rodriguez's role as compared to other co-conspirators such as Cruz and Nelson Bermudez.  The evidence demonstrated that Rodriguez performed an essential role in the mortgage fraud scheme.  The fact that the court found that Rodriguez was not a manager or supervisor in the scheme, so as not to warrant an aggravating role enhancement, does not automatically mean that Rodriguez is entitled to a minor role adjustment. *See id.* at 944 ("[A] defendant is not automatically entitled to a minor role adjustment merely because she was somewhat less culpable than the other discernible participants.").

Rodriguez also argues for the first time on appeal that the district judge improperly applied a categorical rule barring minor role reductions for defendants in large-scale fraud prosecutions when he stated at her sentencing:

> Counsel, let me explain to you why I don't think a minor
> role is appropriate.  This is a case that involved the theft

28

of millions of dollars.  It was a sophisticated scheme.  It involved many, many victims.  And persons who participate in this type of criminal activity, in the Court's opinion, are not entitled to a minor role reduction.  Their acts resulted in substantial harm to the public and the treasury, if you will, and so a minor reduction would be inappropriate in this Court's mind.  So your request for minor role is denied.

(D.E. 734 at 80:1-10.)  Rodriguez contends that this statement is inconsistent with this Court's decision in *Rodriguez de Varon*, in which this Court held that it was improper for a district court to base a minor role reduction solely on a defendant's status without assessing her factual role in the scheme.  *See* 175 F.3d at 942-43 ("[A] defendant's status as a drug courier does not alter the principle that the district court must assess the defendant's role in light of the relevant conduct attributable to her.").

Contrary to Rodriguez's argument, when viewed in context, the judge's statement that a minor role reduction was inappropriate "for this type of criminal activity" is not an application of a categorical preclusion, but is rather a determination that a minor role reduction was inappropriate in *this* case due to Rodriguez's active role in the conspiracy.  As described above, the district judge had just finished hearing over an hour's worth of testimony and argument and viewing multiple exhibits solely concerning Rodriguez's role in the scheme, including a comparison of her role to other co-conspirators.  In a case where a defendant made a similar argument, also for the first time on appeal, concerning a

29

statement the district judge made at sentencing arguably implying that he was

applying a "per se rule" excluding drug "brokers" from being eligible for

mitigating role adjustments, this Court emphasized:

> We cannot accept that a district judge's extemporaneous spoken words of explanation are to be read by appellate judges as if we were reading a statute. . . . We look at the context and at the judge's acts.  And we do not assume that the district judges do not know the law: their ambiguous oral statements, if possible, are interpreted to be consistent (and not inconsistent with) the law.  The last principle applies with particular force when the district judge never had presented to him an objection aimed specially at his choice of words: the kind of objection that would have allowed him the chance to clarify his statements.

*United States v. Cataldo*, 171 F.3d 1316, 1319 n.6 (11th Cir. 1999).  The district

judge properly analyzed Rodriguez's role in the manner contemplated by section

3B1.2 by making an individualized determination, and it is not due to be

overturned.[11]

---

[11] We note that we reach this conclusion based on a clear error standard of review. Because Rodriguez contended that the judge improperly applied a categorical rule that large-scale, sophisticated fraud cases are incompatible with defendants being eligible for minor role reductions, she urged us to review the judge's minor role determination *de novo*, rather than for clear error, because, she argued, it amounted to a legal interpretation of the sentencing guidelines rather than a factual determination.  It is true that we review a district court's application and legal interpretation of the sentencing guidelines less deferentially than its factual findings. *See United States v. Zaldivar*, 615 F.3d 1346, 1350 (11th Cir. 2010).  However, as we have determined that the district judge did not apply a categorical bar, but rather made an individualized fact finding as he was required to do by the guidelines, clear error review is appropriate. *See Rodriguez De Varon*, 175 F.3d at 938 ("[T]he ultimate determination of role in the offense is [] a fundamentally factual determination entitled to due deference and not a legal conclusion subject to *de novo* review."); *United States v. Williams*, 340 F.3d 1231, 1239 (11th Cir. 2003) (explaining that clear error review is appropriate when the ruling involves "the

c.  Restitution

Rodriguez's final argument is that the district court erred by amending the existing judgment to include the restitution amount, as more than two years elapsed from the date of her sentencing and original judgment to the date of her restitution hearing and amended judgment.  She contends that this delay prejudiced her constitutional rights to a speedy sentencing and speedy appeal.  She also argues that the district court's restitution calculation lacked evidentiary support.

We review the legality of a restitution order *de novo* and the factual findings underlying a restitution order for clear error.  *United States v. Valladares*, 544 F.3d 1257, 1269 (11th Cir. 2008).  Whether an action taken by a district court amounts to a constitutional violation is a question of law subject to *de novo* review.  *See United States v. Van De Walker*, 141 F.3d 1451, 1452 (11th Cir. 1998).

The district court was required to order restitution in this case under the Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A (2006).  Under this Act, a person convicted of any crime against property, including any offense committed by fraud or deceit, is required to make restitution to the identifiable victim or victims of the offense.  18 U.S.C. § 3663A(c)(1)(A)(ii), (c)(1)(B).

application of a clearly-established, well-understood legal principle to a detailed fact pattern" because "'the fact-bound nature of the decision limits the value of appellate court precedent'") (quoting *Buford v. United States*, 532 U.S. 59, 65-66, 121 S.Ct. 1276, 1281, 149 L.Ed.2d 197 (2001)).

Pursuant to 18 U.S.C. § 3664(d)(5), a district court may postpone the determination of the amount of restitution for a period not to exceed ninety days, provided the restitution amount is not ascertainable at the time of sentencing. As noted, the Supreme Court recently held that a sentencing court's failure to impose an order of restitution within the ninety-day limitations period does not deprive the court of the power to order restitution at some later date, at least where the sentencing court made it clear prior to the deadline's expiration that it would order restitution, leaving open only the amount. *Dolan*, 560 U.S. at 605, 130 S.Ct. at 2533.

The district court made its intent to order restitution clear, stating during the sentencing hearing that "mandatory restitution is appropriate" and that the sole reason for not imposing the amount of restitution at that time was because the victims' losses were not yet ascertainable. (D.E. 734 at 87:13-22.) Further, the written judgment entered on April 30, 2010, specifically stated that the "determination of restitution is deferred until July 28, 2010." (D.E. 714 at 5.) *Dolan* thus forecloses any argument that the district court lacked jurisdiction or authority to impose an order of restitution more than ninety days after Rodriguez's sentence was imposed.

We are also not persuaded that Rodriguez's due process rights were violated as a result of her delayed restitution hearing and appeal. In *Dolan*, the Supreme

32

Court found no due process violation resulting from the eight-month delay in ordering restitution because the defendant never requested a timely restitution hearing—nor sought mandamus to compel the sentencing court to hold the hearing—and could not demonstrate prejudice. 560 U.S. at 616-17, 130 S.Ct. at 2542. The Court went on to note that "[e]ven in the unlikely instances where that delay does cause the defendant prejudice," the defendant "remains free to ask the court to take that fact into account upon review," and the court may consider the prejudice from the delay, the reason for the delay, and the party responsible for its cause. *Id.* at 617, 130 S.Ct. at 2542; *see also Rheuark v. Shaw*, 628 F.2d 297, 303 (5th Cir. 1980) (cautioning that "not every delay in the appeal of a case, even an inordinate one, violates due process" and instructing courts to consider on a case by case basis the "'[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant'") (quoting *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101 (1972)).

As an initial matter, although she originally asked the court to schedule the restitution hearing, Rodriguez herself sought and received continuances of the hearing on two occasions. Thus, it cannot be said that the government is wholly to blame for the delay. Moreover, Rodriguez has not demonstrated prejudice from the albeit lengthy delay. Importantly, Rodriguez actually benefitted from the delay in that the amount of restitution calculated at the later date was less than it would

33

have been at the time of sentencing, because in the meantime, some of the lenders recouped much of their losses.

Finally, as with the district court's calculation of loss at the time of sentencing, we conclude the district court did not clearly err in determining the amount of restitution. To the extent there is "any dispute as to the proper amount or type of restitution," it shall be "resolved by the court by the preponderance of the evidence," with the government bearing the burden of proof. 18 U.S.C. § 3664(e). The district court, in determining the appropriate amount of restitution, may consider hearsay evidence that bears "minimal indicia of reliability" so long as the defendant is given the opportunity to refute that evidence. *United States v. Hairston*, 888 F.2d 1349, 1353 (11th Cir. 1989) (approving the use of a letter written by the attorney for the victim bank at the restitution hearing as evidence of the bank's loss).

At the restitution hearing before the magistrate judge, a case agent employed by the United States Postal Inspection Service testified as to the lenders' and servicers' loss amounts. She stated that she obtained letters and declarations from the original lenders, as well as lenders who, as of that hearing, held or serviced loans which were fraudulently obtained. She explained her loss calculations, including that she considered in the net loss figures the recoveries, which were obtained when some of the loans were sold at a discount. It was entirely proper for

34

the district court to consider her testimony. *See United States v. Bourne*, 130 F.3d 1444, 1447 (11th Cir. 1997) (deeming as acceptable for purposes of determining the restitution amount the special agent's testimony, which was based on his recollection of the bank auditor's report prepared on the day of the robbery). Following the hearing, the magistrate judge also examined supplemental memoranda submitted by the parties detailing an amended and reduced calculation of the lenders' loss amounts. The district court ultimately limited the restitution order to losses to which Rodriguez was specifically connected and removed from the requested restitution any amounts that were not sufficiently verified. Based on the record before the district court and the non-specific nature of Rodriguez's objections, we cannot say that the district court's restitution order was based upon insufficiently specific and clear factual findings.

IV.    Conclusion

For the foregoing reasons, we affirm Rodriguez's guilty plea, sentence, and restitution order.

**AFFIRMED.**